ROYAL FUEL CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 9386.  Promulgated October 10, 1927.

The March 1, 1913, value of a lease of coal mining property determined.

*Robert G. Bosworth, Esq.*, and *L. E. Williams, C. P. A.*, for the petitioner.

*A. George Bouchard, Esq.*, for the respondent.

This is a proceeding for the redetermination of income and profits taxes for the calendar year 1919, for which the Commissioner has determined a deficiency of $6,693.57. It is alleged that the Commissioner erred in the computation of taxable income by reason of an insufficient allowance for depletion and depreciation upon the lease of a coal mine.

### FINDINGS OF FACT.

The petitioner is a Colorado corporation, with principal offices at Denver, and is engaged in the operation of a coal mine known as the Royal Mine. Prior to March 1, 1913, petitioner acquired a lease upon

certain coal property in Las Animas County, Trinidad District, near Aguilar, Colo., upon which the Royal Mine is located.

On June 20, 1910, the Aguilar Land Association leased to Harry Van Mater 920 acres of coal land in Las Animas County, Colo., for a term of years ending January 1, 1926, upon a royalty basis of 8 cents per ton (minimum production 30,000 tons) for 1911, 9 cents per ton (minimum production 50,000 tons) for 1912, and 10 cents per ton (minimum production 70,000 tons) for 1913 and each year thereafter. On May 5, 1911, Van Mater assigned his lease to the petitioner in exchange for all its capital stock of $100,000 par value. On July 29, 1912, the term of the lease was extended to January 1, 1932. The property contains three veins of coal, the Cameron, the Walsen (or Peerless), and the Robinson, but only the Walsen vein has been worked in the operation of the mine.

The mine had been operated prior to 1902, when it was closed down because of explosions therein resulting in the death of several miners and injury to others, and remained idle until leased to Van Mater in 1910. Because of the reputation of the mine as a dangerous and gaseous mine the petitioner for some time had difficulty in obtaining miners, and in 1913 a strike of coal miners in Colorado was called, which was terminated in the latter part of 1914, all of which retarded the development and operation of the mine. The effect of the strike was felt by petitioner for two or three years thereafter, as most of its customers and potential customers had made long-term contracts with mines in other States to meet their requirements, thus further curtailing the output of the mine. The estimated normal production of 600 tons per day or 150,000 tons per year was first reached in 1917. During this period, from 1911 to 1917, some coal was mined and sold and a loss was sustained in each year until 1917. The operations of the petitioner show tonnage produced and profits and loss per ton as follows:

| Year | Tons | Profit or loss per ton (cents) | Year | Tons | Profit or loss per ton (cents) |
|---|---|---|---|---|---|
| 1911 | 3,716.00 | [1] 20.2 | 1916 | 99,195.86 | [1] 6.9 |
| 1912 | 36,943.84 | [1] 16.7 | 1917 | 155,413.69 | [2] 14.2 |
| 1913 | 36,639.57 | [1] 46.2 | 1918 | 167,717.21 | [2] .1 |
| 1914 | 30,722.65 | [1] 65.2 | 1919 | 173,482.60 | [1] 10.1 |
| 1915 | 80,353.35 | [1] 16.5 | | | |

[1] Loss.     [2] Profit.

In 1913 petitioner unsuccessfully sought a reduction of its royalty rate, to 6 cents per ton, but secured more favorable conditions with reference to the time of making royalty payments. Shortly after its incorporation petitioner offered for sale a bond issue of $150,000, none of which were sold and it had to borrow funds from Denver banks upon the personal security of Van Mater.

' By March 1, 1913, the gaseous condition and other hazardous conditions of the mine had been overcome by the petitioner, the mine was free from excessive gas and water, and the extent of the recoverable coal in the property established. On that date it was known that there were 760 acres of recoverable coal lying in a 6-foot vein (the Walsen) on a 7 per cent pitch toward the coal body, with a hard sandstone roof and shale floor, and with well defined slips or natural breaks in the face of the coal parallel to the pitch of the vein. The average recoverable coal in an acre foot is 1,000 tons and in a 6-foot vein is 6,000 tons per acre. The coal is high-grade bituminous, having a b. t. u. content of 13,500, which is greater than that found in most Colorado coal, and is an excellent steam coal for locomotive and industrial use and a suitable coal for domestic or commercial use.

The natural structure and the location of the mine were such that it could be economically operated and was readily accessible to a large market. The slips in the coal face allowed it to be mined by pick or hand mining, which, in this district, is more economical and produces a higher grade of mine-run coal than machine mining. Because of the gradual pitch of the vein very little power was necessary in removing the coal, and the empty cars were returned to the mine by gravity. The character of the roof and floor of the mine eliminated the necessity for extensive timbering. The mine is located within one or two miles of two main line railroads, the Colorado & Southern and the Denver & Rio Grande, being connected with both by spur tracks, and enjoyed a 25-cent freight differential over 60 per cent of the coal mines in the Trinidad district. Petitioner produced and sold locomotive coal principally, but also produced and sold some commercial coal. The demand for locomotive coal is more constant and less affected by climatic conditions than commercial coal, and since it is practically all run-of-mine coal, requiring no screening, it is more economical to produce.

The improvements and development of the property when acquired by Van Mater in 1910 and the March 1, 1913, values thereof to the owner of the land were: a main hoisting shaft 8 feet 6 inches by 14 feet by 273 feet deep, $20,000; an air shaft, 6 feet by 8 feet by 168 feet deep vertically, and a 45-degree slope 204 feet long, $16,000; work shaft bottom, $4,000; 1,700 feet of main entries and air courses, $5,100; 1,400 feet of cross entries, $2,800; small pump for water, $500; railroad connections, $5,000; hoisting engine, $4,000; preliminary ground preparation, $5,000; and supervision of the work, $5,000; a total of $67,400.

On March 1, 1913, the known coal content in the Royal Mine was approximately 4,560,000 tons, and making due allowance for develop-

ment, the estimated coal recoverable over the remaining life of the lease, 18 years and 10 months, was 2,461,255 tons. The value of petitioner's lease on March 1, 1913, was $50,000.

### OPINION.

VAN FOSSAN: The determination of the March 1, 1913, value of a lease upon coal lands and the proper depreciation, depletion, or exhaustion allowance thereon in computing petitioner's taxable income, is the only question before us in this case. The petitioner claims a value of at least $100,000, inclusive of improvements. The respondent contends that the lease had no value at March 1, 1913, and that, therefore, depreciation, depletion or exhaustion is not allowable.

The petitioner relies upon the testimony of four witnesses, including the principal stockholder of the petitioner, all of whom were familiar with the property. One of the witnesses, an expert valuation engineer, made several appraisal reports upon the property and testified in detail relative to the values fixed by him. The substance of the testimony and these appraisals related principally to the coal content of the property, its minability and the quality of the coal. Two of the witnesses gave their opinion of the March 1, 1913, value of the lease, $150,000 being assigned as the value by one and $323,810 by the other. The greater of these valuations was based principally upon an estimated profit of 50 cents per ton of coal to be mined. The evidence establishes, however, that petitioner suffered a loss upon the coal produced in each year from 1911 to 1916, inclusive, and realized a profit for the first time in the year 1917. It is also noted that although petitioner under its lease was required to produce in 1913 and subsequent years not less than 70,000 tons per year, or in any event to pay the stipulated royalty upon that tonnage, it was not until the year 1915 that it reached a production equal to the specified minimum, and it was not until 1917 that it reached the normal production of 150,000 tons per year. The basis of the lesser valuation is not clear, but it apparently was also predicated on anticipated profits which were not justified by petitioner's operating record. In the light of all the facts the values assigned to the lease by these witnesses can be given little weight. It is also noted that no evidence was introduced in explanation of the wide divergence between the two valuations testified to by these witnesses.

We must determine the March 1, 1913, value of this lease in the light of the facts and circumstances existing or known with reasonable certainty on that date. This record discloses that the petitioner in 1911 acquired a mining property which had the reputation of being a very dangerous and hazardous mine. It appears that the petitioner had extreme difficulty in obtaining labor for the working of the mine and that for a period of six years it sustained annual

net losses per ton on all coal produced, which amount was considerably less than its estimated normal annual production. In a later year, to wit 1919, it again sustained a loss, although the tonnage produced exceeded its estimated normal production. It further appears that during the early years there was no available market in which the petitioner could reasonably expect to dispose of its product even if its estimated normal production of 150,000 tons per year had been reached. The royalty which the petitioner was required to pay under its lease was the average rate obtaining in that district, and on March 1, 1913, its lease had approximately 19 years to run. We are unable to find upon this record that the coal in place gave petitioner's lease any capital value on March 1, 1913.

The petitioner, however, acquired a developed mining property containing improvements and development work having a value to the owner of the land of $67,400 on March 1, 1913. The royalty which the petitioner was required to pay was but the average rate obtaining in that district for undeveloped property. Petitioner, having acquired a developed property at the average royalty rate for undeveloped property, obtained a leasehold of some capital value. This value on March 1, 1913, is to be measured by the use of such development and improvement for the remaining life of its lease.

On March 1, 1913, petitioner's lease had a remaining life of 18 years and 10 months. The value to the owner of the land of the development and improvements on that date was $67,400. Under the peculiar circumstance of this case, considering the character of the business, the hazards of gas explosion, labor troubles, and market conditions, we are of the opinion that the value of petitioner's lease on March 1, 1913, was $50,000, which is subject to exhaustion based upon a tonnage of 2,461,255 tons reasonably recoverable over the remaining life of the lease.

*Judgment will be entered on 15 days' notice, under Rule 50.*

Considered by MARQUETTE, MILLIKEN, and PHILLIPS.